## CHAMBER OF COMMERCE OF MINNEAPOLIS et al. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Eighth Circuit. July 13, 1926.)

No. 256.

**1. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

The "Federal Trade Commission" is no part of judicial system, and does not exercise judicial powers, being an administrative body created by statute, with only duties and powers granted expressly or by fair implication.

**2. Trade-marks, and trade-names and unfair competition ⬌80½, New, vol. 8 A. Key-No. Series.**

Proceedings in Court of Appeals, reviewing cease and desist order of Federal Trade Commission, are of an equitable nature.

**3. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Proceedings before Federal Trade Commission are not amenable to equity rule 38, as to suits by one or more of class, since proceedings are not judicial.

**4. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series—Notice and reasonable opportunity to attend and present evidence and arguments essential on hearings before Federal Trade Commission.**

Hearings before administrative bodies, such as Federal Trade Commission, may be informal, and, if suited to matter involved, rather summary, but must be held on reasonable notice at such time and place as to afford interested parties opportunity to attend with reasonable effort and to present evidence and arguments.

**5. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Federal Trade Commission held to have jurisdiction over members of Chamber of Commerce conducting grain market, and composed of 590 members, although only 13 representative members were served with notice of complaint, in accordance with equity rule No. 38.

**6. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Chamber of Commerce conducting grain market held subject to jurisdiction of Federal Trade Commission, although not organized for profit.

**7. Trade-marks and trade-names and unfair competition ⬌80½, New vol. 8A Key-No. Series.**

Chamber of Commerce conducting grain market, although not itself engaged in interstate commerce, held an instrumentality affecting such commerce authorizing jurisdiction of Federal Trade Commission under Federal Trade Commission Act, § 4 (Comp. St. Ann. § 8836d).

**8. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Any action by, or rule of, Chamber of Commerce conducting grain market, though only indirectly affecting interstate commerce, is subject to Federal Trade Commission Act (Comp. St. Ann. § 8836a et seq.), irrespective of state action, if it results in unfair methods of competition.

**9. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Jurisdiction of Federal Trade Commission to make remedial and preventative orders is measured as of time of order rather than date of filing complaint or hearing thereon.

**10. Commerce ⬌8(1).**

Grain Futures Act (Comp. St. Ann. §§ 8747⅘ to 8747⅘k), passed in pursuance of commerce power of Congress, held to supersede and displace statutes conflicting therewith.

**11. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Federal Trade Commission held without jurisdiction to forbid Chamber of Commerce conducting grain market to deny membership to co-operative associations paying patronage dividends to other than their own members, in view of Grain Futures Act (Comp. St. Ann. §§ 8747⅘ to 8747⅘k).

**12. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Federal Trade Commission held to have had jurisdiction to enter cease and desist order against Chamber of Commerce conducting grain market, except as to certain matters, notwithstanding Grain Futures Act (Comp. St. Ann. §§ 8747⅘ to 8747⅘k).

**13. Constitutional law ⬌90.**

Liberty of the press is not an unrestricted license, and abuse of such right is subject to criminal prosecution and civil liability.

**14. Injunction ⬌98(1).**

Equity does not have jurisdiction to enjoin publication of libel.

**15. Injunction ⬌101(1).**

Publications which are instruments in carrying out a boycott or conspiracy may be restrained.

**16. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Federal Trade Commission held to have jurisdiction to forbid publication by Chamber of Commerce, conducting grain market of paper engaged in carrying out boycott or conspiracy.

**17. Trade-marks and trade-names and unfair competition ⬌80½, New, vol. 8A Key-No. Series.**

Publications circulating in interstate commerce, containing statements constituting part of conspiracy to restrain competition in inter-

state commerce, *held* within jurisdiction of Federal Trade Commission.

**18. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Under Federal Trade Commission Act, § 5 (Comp. St. Ann. § 8836e), findings of Commission are conclusive if supported by substantial evidence.

**19. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Where Chamber of Commerce conducting grain market instigated misleading publications and statements and vexatious litigation relative to competing concern, conclusion of Federal Trade Commission that such actions constituted unfair methods of competition was warranted.

**20. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Chamber of Commerce conducting grain market *held* not justified in employing false and misleading propaganda against competing concern because of use of similar means against it by such competitor.

**21. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

That Chamber of Commerce had ceased publishing misleading information relative to competitor, before complaint before Federal Trade Commission was issued, is not of itself sufficient to vacate order that it cease and desist therefrom.

**22. Monopolies** ☞17(2).

Boycott by members of Chamber of Commerce conducting grain market, by refusing to deal with members of another exchange and an association of producers, shippers, and handlers of grain, *held* violation of the Federal Trade Commission Act, when carried on by concerted action for purpose of hindering competition in interstate commerce.

**23. Monopolies** ☞17(2).

Federal Trade Commission *held* justified in concluding that resolutions of Chamber of Commerce conducting grain market, relative to its members' dealing with firms or individuals employing certain methods, constituted an effective boycott of members of a certain association, which was properly to be forbidden.

**24. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Federal Trade Commission *held* without jurisdiction of controversy relative to membership in Chamber of Commerce conducting grain market as a contract market under the Grain Futures Act (Comp. St. Ann. §§ 8747⅘ to 8747⅘k).

**25. Exchanges** ☞13.

Daily market quotations of Chamber of Commerce conducting grain market, though its property, are affected with public interest and subject to reasonable regulation.

**26. Trade-marks and trade-names and unfair competition** ☞68.

Chamber of Commerce, conducting grain market, *held* not guilty of unfair competition by refusing to supply its daily market quotations to competing concern, formed for purpose of destroying and replacing chamber, or to an association which organized the competing concern and its members.

**27. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Order of Federal Trade Commission, prohibiting Chamber of Commerce conducting grain market from passing or enforcing rule prohibiting members from paying more than market price less established commission for grain on track at country points, *held* not justified.

**28. Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Order of Federal Trade Commission, forbidding Chamber of Commerce conducting grain market to publish misleading information relative to competitor, or to institute unfounded suits, or to obstruct its business, and forbidding conspiracy to boycott competitor, *held* not invalid as being indefinite.

On Petition to Review Order of Federal Trade Commission.

Original proceeding by the Chamber of Commerce of Minneapolis and others to review a cease and desist order of the Federal Trade Commission. Order affirmed in part, and in part set aside.

David F. Simpson, of Minneapolis, Minn. (Lancaster, Simpson, Junell & Dorsey, of Minneapolis, Minn., on the brief), for petitioners.

Adrien F. Busick and Charles Melvin Neff, both of Washington, D. C. (W. H. Fuller, of Washington, D. C., on the brief), for respondent.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

STONE, Circuit Judge. This is an original statutory proceeding to review a "cease and desist" order of the Federal Trade Commission.

### I. The Pleadings.

The pleadings consisted of (1) the complaint, (2) motions and answer of the Chamber of Commerce and the named directors, officers and members, (3) motions and answer of the Manager Publishing Company and John F. Fleming, (4) motions and answer of John H. Adams, and (5) application for dismissal by all of the respondents.

### (1) The Complaint.

The complaint was in two counts. The substance thereof may be stated as follows: It was against "the Chamber of Commerce of Minneapolis; the officers, board of directors, and members of the Chamber of Commerce of Minneapolis, Manager Publishing Company; John H. Adams; and John F. Fleming, all hereinafter referred to and named as respondents herein."

It named, as respondents, fourteen individuals alleging they were officers or directors of said Chamber of Commerce and thirteen of them to be members thereof, and that "said respondent members constitute a class so numerous as to make it impractical to name them all as parties respondent herein, but those designated herein are fairly representative of the whole."

It alleged that the Chamber of Commerce (hereinafter called Chamber) was a "nonstock or membership corporation organized and existing for the profit of its members" and conducting a grain market for the exclusive use of its members wherein approximately 200,000,000 bushels of grain was dealt in annually by them, and that it dealt in "valuable business and commercial information consisting chiefly of price quotations of various kinds of grain and other market news." That much of the grain so dealt in by the members on the floor of the Chamber was interstate commerce grain and that the market quotations and news was sent and received through interstate commerce instrumentalities to and from other states. That the members were governed in their dealings by rules and regulations of the Chamber so that their interstate grain transactions were controlled thereby. That the grain market furnished by the Chamber for the exclusive use of its members served six states and held a monopoly of such business.

That the respondent, Manager Publishing Company, is a corporation publishing a grain trade paper (The Co-operative Manager & Farmer) which circulates in the trade territory tributary to Minneapolis and respondents John H. Adams and John F. Fleming are stockholders therein and editors thereof. That the Equity Co-operative Exchange (hereinafter called Equity) is a co-operative association or corporation with offices in various states and having a membership of about seven thousand grain raisers, shippers and dealers living in various states of the Northwest. That such association is the receiving and selling agent for grain shipped to it by its members, much of which is interstate shipments. That it operates terminal and country elevators in various states. That it deals, also, in grain consigned to it in interstate commerce by nonmembers and on its own account. That it is engaged, also, in disseminating market information. That it conducts its business on the basis of paying "patronage dividends," which means division of net profits among its patrons in proportion to patronage.

That being barred from the Chamber and other regular markets because of its "patronage dividend" character, the Equity established (with others) the St. Paul Grain Exchange (hereinafter called Exchange) at St. Paul in 1914 and became a member thereof. That the St. Paul Grain Exchange is a non-stock or membership corporation conducting a grain market and permitting its members to allow patronage dividends. That its members are engaged in dealing in various grains.

That the members of the Equity and of the Exchange are in business competition with the members of the Chamber. That a great portion of the grain dealt in by the various members of each is interstate commerce grain. That respondents are and for more than three years have been in a conspiracy to destroy the Exchange and the business of the Equity and its members for the purpose of perpetuating the monopoly of the Chamber and its members.

That this conspiracy has been and is being carried out by a campaign of defamation, false litigation, oppression and boycott. The defamation consisting (1) of publication, in the above trade paper and other publications, and circulation among patrons and prospective patrons, of the Equity and of the Exchange, of false statements concerning the financial responsibility and business methods of the Equity and of the Exchange; and (2) similar false statements by the traveling solicitors, agents and employees of many of the respondent members of the Chamber. The false litigation consisting of instigating and carrying on, in 1914 and 1915, three designated actions against the Equity and other members of the Exchange, these actions being one brought in the United States District Court for Minnesota by J. Emerson Greenfield and Samuel Crumpton (partners as Greenfield & Crumpton); another in a state court of North Dakota, by Fred Schmidt, J. Emerson Greenfield and Samuel Crumpton; and another, in the same state court, by the State of North Dakota ex rel. Henry J. Linde, Attorney General. The oppression consisting in refusing the Exchange and its members the daily mar-

ket quotations of the Chamber, which it disseminates to nonmembers of the Chamber, and in inducing other terminal markets to refuse their like quotations. The boycott consisting in members of the Chamber refusing, under compulsion of certain rules adopted by the Chamber for that purpose, to buy grain from the Equity.

That said conspiracy is further being executed under compulsion and by means of certain rules, regulations and customs of the Chamber and its members, which discriminate against nonmembers; depress prices paid for grain bought from producers; impose arbitrary and unearned charges on "on track" grain at country points; discriminate in favor of grain shipped from certain other terminal markets; establish unreasonably high commission rates; and prevent the members of the Chamber from transacting business on a true competitive basis or a "patronage dividend" basis.

That such conspiracy is being further executed through contracts binding country shippers to ship all of their grain to members of the Chamber who finance such shippers.

## (2) Motions and Answer of the Chamber et al.

These motions were to dismiss, to strike and for orders that no issue of fact be joined as to certain parts of the complaint. The motion to dismiss was (1) to dismiss the complaint generally, (2) to dismiss generally as to John B. Gilfillan, Jr., and Asher Howard, and (3) to dismiss as to the Chamber and the individuals named as secretary and "as officers and directors thereof." The motion to strike was divided into three paragraphs aimed at designated portions of the complaint as follows: (1) Those touching market quotations, the boycott charge and the charge as to certain rules of the Chamber which, in general, the petition alleged as preventing competition and being discriminatory; (2) those charging contracts for exclusive shipment from shippers financed by members of the Chamber; (3) those charging defamation by publications and by solicitors, agents and employees of members of the Chamber. The motion for orders that no issue of fact be joined or evidence received was in three paragraphs and related to the same matters as the motion to strike.

The bases of the motions were (1) that the filing of, the hearing and order on, the complaint denied due process under the Fifth Amendment to the Constitution; (2) that the Federal Trade Commission is not a fair and impartial tribunal to hear and determine the matters covered in its complaint which was based on ex parte information; (3) that the Commission is without jurisdiction to make orders concerning the methods of business of the Chamber because (a) the Chamber is not organized to carry on business for the profit of itself or its members, (b) it does not deal in grain nor is it engaged in commerce but merely furnishes a market place for its members and does not affect interstate commerce in any way, (c) dissemination of market quotations and reports is not interstate commerce and withholding same from the Exchange, located in Minnesota also, does not involve nor interfere with interstate commerce, (d) the Chamber exists in accordance with Minnesota statutes authorizing its organization and expressly endowing it with control over, adoption and enforcement of rules governing the admission, control and discipline (even to expulsion) of its members; that all of the rules covered by the complaint are authorized by the state statute and are not within the control of the Commission and Congress has not given such control to the Commission; (4) the complaint fails to state a cause of action under the act creating the Commission, either generally or in the particulars following: (a) In so far as it relates to the organization, existence, functions, rules and resolutions of the Chamber, especially as to charges respecting market quotations, boycott and rules which prevent competition and discrimination, (b) the practice of members of the Chamber advancing money to grain shippers and contracting, in connection therewith, for shipment of grain by those shippers to them, such practices not constituting unfair competition, (c) the acts complained of as constituting unfair competition are against only one "so-called" competitor, hence are not of a "public interest" within the meaning of the act creating the Commission, (d) the rules complained of are in aid of the expressed public policy of the state, have long been maintained by the Chamber and similar organizations throughout the United States, do not constitute unfair competition and constitute no cause of action under the act creating the Commission.

### The Answer.

The allegations of the answer are, in substance, as follows: Organization of Chamber, under state statutes, with control over membership; furnishes a market place for its members; no profit to it; market dealings are matters of profit between the mem-

bers engaging therein and Chamber has no share therein; such dealings in the Chamber regulated by rules of the Chamber to secure fairness and integrity; "patronage dividends" from commissions by members to customers prohibited by rule fixing minimum commission; denies monopoly but alleges that favorable trade conditions in the Chamber arising from its enforcement of fair dealing has induced a large number of producers, shippers and dealers in grain to use that market voluntarily; the creation and voluntary use of such favorable conditions and facilities for trading does not constitute monopoly; does not buy, sell or exchange market quotations and news but permits telegraph companies to secure same on its trading floor and to send out same during market day "in a limited manner and for a limited use" and makes such available for public use at end of market day; membership open and made up of individuals, many of whom deal, for themselves or others, in interstate commerce grain on the trading floor.

Of the respondents named, John G. McHugh is secretary of the Chamber but not a member thereof, those named as officers are not and were not such at time complaint was filed, some of others are not directors, some are directors, Asher Howard and J. B. Gilfillan are not members; respondents Andrews and Dalrymple are grain dealers on the Chamber floor on their own account and for others; McLeod is a member of a commission firm trading for others on the floor; other of the respondents are executive officers of corporations trading on the floor. There are 593 members of the Chamber, some of whom are residents of states other than Minnesota.

Members not regulated as to any business except that transacted on trading floor. Relationship of individual respondents to the Chamber is the same but there is no similarity as to relationship with each other in business methods or practices which latter are independent and competitive.

Manager Publishing Company publishes a trade paper, The Co-operative Manager & Farmer, which circulates generally among farmers and grain dealers in Northwestern States. John H. Adams is a stockholder in the above company but has not been connected in any way with the publication of the above paper since 1916. John F. Fleming is such a stockholder and has been manager of such company and editor of such paper since 1916.

The Equity is consignee at St. Paul of considerable quantities of grain which is sold by it and immediately shipped out of Minnesota. From 1907 to 1917, the principal business of the Equity was commission merchant but now it is principally engaged in operation of a line of country elevators, owned by it, and the larger part of the grain shipped to it at St. Paul is that from its line elevators. In securing consignments of grain, the Equity competes with members of the Chamber just as such members compete among themselves.

There is no business nor business competition in distribution of market news.

Patronage dividends not paid by Equity until after 8% dividends to stockholders therein. Membership in Chamber not denied to those allowing patronage dividends on earnings other than commissions for handling grain. Chamber admits members who pay ordinary corporate dividends to their own stockholders on entire earnings from all sources, including commissions for handling grain; such members may be incorporated Farmers' Selling Agencies or Farmers' Co-operative Elevator Companies organized by producers at a country station.

The Equity has never applied for membership in the Chamber. Prior to 1912, the Equity sought by publications to discredit the Chamber and claimed to have established an independent grain exchange but no such exchange was established until 1914, when the Equity, with others, established and became a member of the Exchange. Deny that respondents have at any time harrassed or attempted to destroy either the Equity or the Exchange.

The Exchange is a grain market with membership limited to producers of grain and farm products and does not permit its members to allow "patronage dividends" but prohibits same under a minimum commission rule such as the Chamber and other grain exchanges employ. Some of the members of the Exchange deal in grain in competition with members of the Chamber.

A large portion of the grain dealt in by members of the Exchange and of the Chamber is interstate commerce grain.

Deny any conspiracy to harass or destroy the Exchange or the business of any of its members, including the Equity. Deny any conspiracy of defamation of the Exchange or any of its members or any defamation of such by traveling solicitors or others.

During 1914, the Chamber, at the request of J. H. Adams, editor of the Co-operative Manager & Farmer, guaranteed to him expenses for employment of counsel for Fred Schmidt in action by Schmidt, a stockholder

of the Equity, to examine the books of the Equity. This it did to vindicate this stockholder's rights and not to injure the Equity and if the Equity was injured thereby it was because of its wrongful refusal of inspection of its books by such stockholder. This suit resulted in an order permitting examination which was affirmed by the State Supreme Court. During the above litigation, the Equity removed its books from North Dakota and as a result the action, State ex rel. Linde, Attorney General, was brought. This second action was not instigated by the Chamber but was brought to the attention of the State Attorney General by one Engerud, attorney for Schmidt, wholly of his (Engerud's) own motion. Respondents had no knowledge of the suit brought in the United States court for Minnesota until after it was brought and have never agreed to nor contributed to the expense thereof.

The market quotations of sales on the Chamber floor are property of the Chamber. It assembles such primarily for the use of its members for use on its floor in the same market day and permits no other use except to telegraph companies to be sent by them to such persons or associations as are approved by the Chamber and only to them for limited use, it being the policy of the Chamber to limit use thereof to promote and as an incident of trading in the Chamber by or through its members. That no publication or public use thereof is permitted during the market day on which they are made. At the end of the market day, they are open to public use. It exchanges such quotations with other markets only where such other quotations are desired by its members and when it appears that such will facilitate business between the members of the respective markets. No future trading or continuous market quotations are made by the Exchange and it can furnish no market information of value to members of the Chamber in exchange for the quotations of the Chamber. Men expelled from the Chamber are members of the Exchange and to permit the Exchange to have the quotations of the Chamber would be to give such discredited persons the benefit of use of this property of the Chamber. To furnish such quotations to the Exchange would be a gift of the property of the Chamber without any basis therefor or limitation thereon and would amount to a publication thereof and a consequent deprivation to the Chamber of its property rights therein and control over the use thereof. Such quotations are refused the Exchange but not from any purpose to embarrass the Exchange, its members or patrons or to prevent its growth as a grain market.

Deny any conspiracy to boycott the Equity for the purpose of embarrassing or destroying the Exchange or its members. The members of the Chamber are at liberty to deal with the Equity and buy grain therefrom. Admits two resolutions of the Chamber forbidding its members from selling on its floor grain purchased by or consigned to them when such member has reason to believe that the original shipper was induced to consign or ship same by a misrepresentation as to the place where or the terms and conditions under which the grain would be marketed and where the sale thereof on the floor of the Chamber would aid in carrying out such plan to deceive such shipper. Such resolutions were passed to protect shippers to the Minneapolis market and to prevent frauds as to all grain handled on said floor.

Admits uniform and minimum commission rule and alleges that such rule was applied to "track sales" made with intent and for the purpose of reselling on floor of Chamber because necessary to make above rule effective. Such rule does not establish or maintain monopoly nor restrain trade in grain. Such rules have long been in general operation in grain exchanges throughout the United States. Such rule does not tend to destroy the business of the Exchange or of its members, but the Exchange has a like rule which, in like manner, prevents "patronage dividends" or rebates as to commissions. Such rules are necessary to secure the equality, fairness and integrity of transactions on a grain exchange where grain is consigned by a great number of people over a wide territory. Such a rule prevents discrimination and protects shippers who have no terminal offices nor special knowledge as to outlets for and purchasers of grain. That the rates established by such rules are fair and reasonable and precisely the same required by the rules of the Exchange.

No limit on opportunity to form grain market on different plan and much advertisement that such had been done but great bulk of grain sent to this market is consigned for sale on floor of Chamber, including 95-99% of grain shipped to such market by Farmers' Co-operative Elevator Companies.

Members of the Chamber, as individual dealers, unassisted and in competition, often loan money to elevator companies and frequently it is agreed that such company shall ship certain portions of its grain to such member for sale on the floor of the Chamber

or some other terminal market. Such arrangements are individual, are highly beneficial to the elevator companies and are not designed to injure the Exchange or its members. The same practice is followed by the Equity and by other members of the Exchange.

(3) Motions and Answer of Manager Publishing Company and John F. Fleming.

### The Motions.

The prayers of these motions are that the complaint be dismissed as to these respondents, that the paragraphs of the complaint charging defamation by publication be stricken out and that an order be made denying issue of fact and evidence as to matters in such paragraphs. The bases of the motions are as follows: (1) That the filing of and the hearing and order on the complaint denied due process under the Fifth Amendment to the Constitution; (2) that the Commission is not a fair and impartial tribunal to hear the matters covered by the complaint; (3) that the Commission has no jurisdiction because the publication and circulation of the Co-operative Manager & Farmer is not interstate commerce and does not directly affect it.

### The Answer.

The allegations of the answer are, in substance, as follows: The Manager Publisher Company (hereinafter called Publisher) is a corporation owning and publishing, at Minneapolis, a grain trade paper, the Co-operative Manager & Farmer (hereinafter called Publication) which circulates among farmer elevator companies and independent grain dealers in the northwestern and other states. Fleming is a stockholder and officer of the Publisher and has been editor of the Publication since October, 1916. John H. Adams is such stockholder and was such editor prior to October, 1916. Deny any conspiracy to embarrass or destroy the business of the Exchange, or the Equity or of any member of either for the purpose of securing a monopoly of the grain trade to members of the Chamber.

Deny publication of defamatory, false, misleading or unfair statements concerning the Exchange, its officers or members or the Equity, its officers and stockholders, or concerning their financial responsibility or business methods. For years ending early in 1917, the Publication contained many statements concerning the Exchange. The Publication is devoted to the interests of the grain movement and its success depends largely up-

on the growth and stability of the farmer elevator movement. The above statements in the Publication were published with an honest belief in the truth thereof after investigation and there was a continual offer and readiness to correct any inaccuracies therein, but no inaccuracies have ever been called to their attention and respondent Fleming now states he believes every such statement to be true. No such statements were made for the purpose of injuring the Exchange or the Equity but solely in the interest of the farmers, grain dealers and the farmer co-operative grain movement.

The Publisher and its then editor, J. H. Adams, aided Schmidt in his suit, as a stockholder of the Equity, for an examination of the books, records and documents of the Equity, by securing money to employ counsel and by information. It aided this investigation because the Equity was widely soliciting grain consignments, on the basis of co-operative dividends, and stock subscriptions; there was much conflicting public discussion in the press as to the financial condition and business methods of the Equity; the Publisher and its editor were frequently asked for information thereabout; that the public was entitled to know the facts and that such investigation would reveal the facts and be of public value and interest. The Publication contained such portions of the evidence therein as were deemed of legitimate public interest or value. None of such acts were purposed to injure or unfairly treat the Equity or its officers; deny all connection with the other suits.

Until the sales manager of the Equity died, in 1916, he had conducted a campaign of misrepresentation against the Chamber and its members and the manner of handling grain in the Chamber. In about the above year, the character of the business of the Equity largely changed from a commission business to that of owner and operator of a large line of country elevators. Thereafter, the commission business of the Equity declined and its campaign of misrepresentation ceased. Therefore, it was no longer important to inform farmers and others as to the actual condition surrounding grain handling at the Minneapolis terminal by members of the Chamber or others. Hence, statements in the Publication concerning the Equity entirely ceased more than four years before this complaint was filed and there is no intention in the future of publishing statements as to the manner the Equity handled grain consignments in the past. There is no longer any newspaper controversy concerning the man-

ner of handling grain either in or outside of the Chamber.

Deny any unfair methods of competition within the meaning of section 5 of the act creating the Commission.

(4) Motions and Answer of John H. Adams.

The motions were the same as those by the Publisher and J. F. Fleming above.

The answer is, in general outline and substance, the same as that of the Publisher and J. F. Fleming above. He had no control or management of the Publication after October, 1916. His connection with statements in the Publication, prior to October, 1916, concerning the Equity was similar to that of Fleming during a part of 1916 as revealed in the above answer and his aid to Schmidt was securing and furnishing information for use in the suit brought by Schmidt.

(5) Application for Dismissal.

After denial of the above motions, the respondents filed an Application for Dismissal of Proceeding. This Application called to the attention of the Commission certain matters occurring after filing of the above motions and answers and the submission of such motions. Those new matters were as follows:

(a) Passage of the Future Trading Act (Aug. 24, 1921, 42 Stat. L. 187), and designation of the Chamber as a "contract market" by the Secretary of Agriculture under authority of that act. The inconsistency of the supervision given the Secretary of Agriculture under that act with the exercise of the powers of the Commission over such matters as are covered by this complaint. The voluntary admission to membership in the Chamber of representatives of co-operative associations of producers who may rebate commissions to bona fide members of such associations. The pendency of a suit in the Supreme Court (Hill v. Wallace) to test the validity of such act. Respondents suggested suspension of further proceedings herein until determination of that litigation.

(b) The attention of the Commission was called to an act of the Minnesota Legislature (March 18, 1921, c. 99) declaring exchanges like the Chamber to be public markets and regulating memberships and membership rights therein. Also to chapter 314 of the Laws of Minnesota 1921, placing such markets under the supervision of the State Railroad and Warehouse Commission. Also to rules regulating such markets promulgated by that Commission under authority of said chapter 314.

Respondents contended that unless the Future Trading Act be held to put such regulation within the exclusive control of the Secretary of Agriculture, that the above state acts were valid exercises of the police power of the state and controlling.

In passing it may be noted that the suit— Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822—was decided May 15, 1922, and the act was held invalid. This Application was deferred, on July 1, 1922, until the complaint should be presented on its merits. Hearing under the complaint began September 5, 1922.

II. Findings, Conclusion and Order of Commission.

Hearings were begun on this complaint September 5, 1922. Findings and conclusions and the "cease and desist" order, here involved, were made by the Commission on December 28, 1923.

Finding of Fact. ·

The respondents named as directors, officers and members of the Chamber were such and were fairly representative of the entire membership, as a class, which was so numerous that all could not be made parties "without manifest inconvenience and oppressive delay."

The Chamber was a non-stock or membership corporation conducting a grain exchange for the exclusive use and profit of its members, who were governed and bound by the charter, rules, regulations, usages and customs thereof. It was the largest wheat market in the United States and its members dealt, therein, in a large amount of grain, much of which was in interstate commerce. It dealt, also, in its own and other market quotations. About 90% of the grain received at Minneapolis was shipped to and dealt in by such members.

The Equity was a corporation with a large number of stockholders residing in several states and practically all of whom were raisers of grain which was shipped to the Equity as sales agent or to be bought and sold on its own account. Also, it owned about seventy-five country line elevators and a large terminal elevator in St. Paul. Much of the grain so dealt in by it was in interstate commerce. Since August, 1914, its principal business office has been in St. Paul with other offices in North Dakota, Wisconsin and Montana.

In August, 1914, the Exchange was organized by the Equity and others as a non-stock or membership grain exchange. Its rules did

not prohibit "patronage dividends," as did the rules of the Chamber.

The members of the Chamber are in competition in dealing in interstate commerce grain with the Equity and its stockholders and with the members of the Exchange.

The respondents Adams and Fleming were stockholders in the Publisher, the former being editor until October, 1916, and the latter thereafter. The policy of the Publication was dominated and controlled by the secretary of the Chamber, who furnished the data and material for a great number of the articles hereinafter described.

The "Uniform Commission Rule" of the Chamber, as applied to purchases of grain in car lots "on track" at country points, had a tendency to depress grain prices by limiting the price to that of similar shipments to the Minneapolis market.

Members were prohibited from rebating commissions or paying "patronage dividends" and membership was refused to co-operative associations, like the Equity, which allowed such dividends. This action of the Chamber hindered and suppressed competition from co-operative terminal marketing of grain and protected the members of the Chamber from the competition of such marketing.

The Chamber permits market quotations of sales on its trading floor to be transmitted therefrom by telegraph companies in "continuous" (less than ten-minute) or "periodical" (more than ten-minute) services. This transmission is to other exchanges and nonmembers which are approved by the Chamber with the right in the Chamber to prohibit such services to any one at its pleasure. It exercises complete control over the selection of those to whom such services are sent. Knowledge of such quotations are necessary to any one dealing in car lot grain. After July, 1914, the Equity and the Exchange applied for such services but were refused such by the Chamber, although each of them was ready, able and willing to pay therefor and to abide by and agree to all of the rules and regulations required of applicants and subscribers by the Chamber and nothing in the conduct of the business of either of them prevented such compliance.

The Chamber and its members conspired among themselves and with others to boycott and refuse to deal with the Equity, its stockholders or the members of the Exchange and to induce others to so refuse. For more than ten years, respondents have been engaged in a conspiracy to embarrass and destroy the business of the Equity and its stockholders and of the Exchange and its members, with the purpose of maintaining a monopoly in the grain trade. Such monopoly has been so maintained and has unduly hindered and restrained competition in interstate commerce between the members of the Chamber on the one hand and the Equity, its stockholders and members of the Exchange on the other.

Acts in pursuance of the above conspiracy were as follows:

(a) A resolution (No. 405) passed by the Chamber in October, 1912, falsely charging that nonmembers, in many cases, obtained members to sell grain which was shipped because of false statements and forbidding members from handling grain for nonmembers who solicited grain shipments from farmers or country shippers by false statements concerning the dealings in the Chamber or concerning the right of grain shippers with respect thereto or "unless the person so soliciting such shipment can show a written statement of the shipper to the effect that he realizes that the person receiving such shipment is not a member of the Chamber and cannot get advantages out of the Chamber which he could not himself get." The purpose and effect of this resolution was to cause expense, delay and loss of business to such competitors.

(b) A second resolution (No. 634), in January, 1916, which was interpreted by the Chamber as forbidding its members to act in any manner for the Equity or its stockholders and was so enforced.

(c) Between May, 1912, and May, 1917, publication of false and misleading statements concerning the financial responsibility and business methods of the Equity, the Exchange, their officers and members. These publications and reprints thereof were circulated among patrons and prospective patrons of the above. Certain of these publications attacked the Equity, the Exchange, editors who commented favorably on the Equity and country elevators shipping to the Equity; advised directors of country elevators not to interfere with the managers of such in choosing persons and places to which grain should be shipped; pretended to offer expert advice on co-operative marketing while conducting a campaign against co-operative terminal marketing.

(d) Subsidized the former official organ of an association of farmers (American Society of Equity), which had been affiliated with the Equity, and circulated copies thereof containing articles defamatory to the Equity and in praise of the Chamber—such pub-

lication carrying the false legend that it was still such official organ.

(e) Publication of false statements concerning "double commissions" charged by Equity, refused to retract same and thereafter reiterated them.

(f) Espionage of the Exchange and its transactions. Sent letters to banks, farmers, customers of the Equity and others designed to injure the credit and standing of the Equity with such persons. False or misleading statements concerning loss of profits and double commissions as to grain handled by the Equity.

Although these false, unfair and misleading publications ceased in 1917, the matter so circulated has been and is still being used by farmers, bankers, shippers and country elevator officials to the financial injury of the Equity.

(g) For the purpose of destroying the Equity, by having it declared insolvent and a receiver appointed, they instigated and financed the Schmidt suit and induced about fifty members of the Chamber to make affidavits to aid in the Linde suit, which was dismissed because the Equity was solvent. Instigated and financed the suit in the United States court in bad faith and for the purpose of hindering and obstructing the business of the Equity and of injuring its credit and reputation.

(h) Inquiries and investigations at banks and other financial backers of the Equity and its stockholders for the purpose of creating suspicion concerning them and injury thereto.

These actions caused substantial expense to the Equity; injured its credit and standing with grain shippers and the public and the same result followed the allegations of unfair and dishonest conduct made and published in connection therewith.

### Conclusion.

"That by reason of the facts set forth above, the respondents and all of them, have committed acts to the prejudice of the public and competitors of respondent Chamber and competitors of the members of respondent Chamber, and which acts constitute unfair methods of competition in commerce within the intent and meaning of section 5 of an Act of Congress (Comp. St. § 8836e), entitled, 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' approved September 26, 1914."

### Order of Commission.

The order was divided into three divisions. The first was directed to all of the respondents and forbade conspiracy for the publication or circulation of any false or misleading statements concerning the financial standing, business or business methods of the Equity, its officers or stockholders, or of the Exchange, its officers or members; and for institution of vexatious or unfounded suits against the Equity with the purpose of hindering or obstructing its business or of injuring its credit or reputation.

The second division of the order was directed at the Chamber, its directors, officers, members and representatives and forbade the acts and things following:

"(1) Combining and conspiring among themselves or with others directly or indirectly to induce, persuade or compel and from inducing, persuading or compelling any of the members of said Chamber, their agents or employees, to refuse to buy from, sell to, or otherwise deal with the St. Paul Grain Exchange or its members or the Equity Co-operative Exchange, or its stockholders, or the customers of any of them, because of the patronage dividend plan of doing business adopted by the said Equity Co-operative Exchange, or by any of the members of the said St. Paul Grain Exchange, as more particularly set forth in paragraph (4) infra of this order.

"(2) Hindering, obstructing or preventing any telegraph company or other distributing agent from furnishing continuous or periodical price quotations of grains to the St. Paul Grain Exchange, or its members, or to the Equity Co-operative Exchange or its stockholders.

"(3) Passing or enforcing any rule or regulations, or enforcing any usage or custom, that prohibits or prevents members of the respondent Chamber from conducting their business of dealing in grain according to the co-operative method of marketing grain or according to the patronage dividend plan, like or similar to the method or plan adopted by the Equity Co-operative Exchange.

"(4) Denying to any duly accredited representatives of any organization or association of farmer grain growers or shippers admission to membership in said respondent Chamber, with full and equal privileges enjoyed by any or all of its members or by any or all concerns represented by membership in said respondent Chamber of Commerce, be-

cause of the plan or purpose on the part of such organization or association to pay or propose to pay patronage dividends or to operate or propose to operate according to the co-operative plan of marketing grain, namely, the plan of returning any portion or all of its earnings or surplus to its patrons or members on the basis of patronage, whether such earnings or surplus is derived from charging patrons or members commissions or otherwise.

"(5) Passing or enforcing any rule or regulation or enforcing any usage or custom, that compels shippers of grain to Minneapolis, Minnesota, from country points or from St. Paul, Minnesota, to pay commission or other charges, unless and until like commissions and charges are paid by shippers of grain to Minneapolis from Omaha, Nebraska, or from Kansas City, Missouri, or other such favored markets.

"(6) Passing or enforcing any rule or regulation, or enforcing any usage or custom, that prohibits members of the respondent Chamber, when buying grain on track at country points from paying therefor more than the market price of similar grain prevailing at that time in the Exchange Room of the respondent Chamber, less freight, commissions and other charges.

"(7) Promulgating, interpreting or enforcing any rule, custom, regulation or usage in such manner as to require any member of respondent Chamber to pay to the farmer, or country shipper or other person, a price for grain limited to a price equivalent to or identical with the Minneapolis market price, or otherwise limit the exercise of free will and individual independent judgment of any such member as to the price which he shall pay, or which he desires to pay farmers, country shippers, or other for grain on track at country points."

The third division of the order required respondents to report in detail in writing to the Commission, within sixty days of service of the order upon them, the way in which they had complied with the order.

### III. The Issues.

The issues presented in this proceeding to review the action and order of the Commission are numerous but may be divided generally into three classes: A. Those which challenge the jurisdiction of the Commission. B. Those which question the sufficiency of the findings upon which the Conclusion and the Order of the Commission are based. C. That the order is so indefinite that it cannot be followed or enforced.

### A. Jurisdictional Issues.

There are three jurisdictional issues as follows: (1) That there is no jurisdiction over members of the Chamber who are not named in the complaint and upon whom it was not served; (2) That there is no jurisdiction over the Chamber; (3) that there is no jurisdiction over the publications of which complaint is made.

### 1. Jurisdiction over Members.

It is manifest, and petitioners concede, that the Commission intended and endeavored to include all of the members of the Chamber by designating certain of them as representatives of a class in accordance with the principle expressed in Equity Rule No. 38. That rule is as follows:

"When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

[1] The Federal Trade Commission is no part of the judicial system of the United States. It does not exercise judicial powers. It is an administrative body created by statute. It has only such duties and powers, as are given it, by expression or fair implication therefrom, by statute. Its granted powers of citing parties, summoning witness and holding hearings are merely means proper to enable it to determine matters of fact upon which depend the operation of the statute against unfair competition in interstate commerce.

[2-4] When "cease and desist" orders come before a Court of Appeals, the proceedings in such court are of an equitable nature. However, the proceedings before the Commission are not judicial and are, therefore, not amenable to a rule designed to control only equitable proceedings before a body exercising judicial power. But the fact that Equity Rule 38 is not controlling does not determine the point raised here. While hearings before administrative bodies need not have all of the formality of judicial procedure but may be informal and, if suited to the matter involved, rather summary (Davidson v. New Orleans, 96 U. S. 104, 107, 24 L. Ed. 616; Hagar v. Reclamation Dist., 111 U. S. 701, 708, 709, 4 S. Ct. 663, 28 L. Ed. 569; Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112, 118, 17 S. Ct. 56, 41 L. Ed. 369), yet there are certain elements of fair play required by the Constitution which are necessary in any character of hearing affecting personal or property rights. In respect to hearings before administrative

bodies (as well as judicial tribunals) those elements include (1) a reasonable time and place for hearing where interested parties may attend with reasonable effort (Bellingham Bay & British Columbia R. Co. v. New Whatcom, 172 U. S. 314, 319, 19 S. Ct. 205, 43 L. Ed. 460); (2) reasonable notice to interested parties (Londoner v. Denver, 210 U. S. 373, 385, 28 S. Ct. 708, 52 L. Ed. 1103; English v. Arizona, 214 U. S. 359, 29 S. Ct. 658, 53 L. Ed. 1030; Bellingham Bay & British Columbia R. Co. v. New Whatcom, 172 U. S. 314, 19 S. Ct. 205, 43 L. Ed. 460; Bauman v. Ross; 167 U. S. 548, 17 S. Ct. 966, 42 L. Ed. 270; Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; Paulsen v. Portland, 149 U. S. 30, 13 S. Ct. 750, 37 L. Ed. 637; Lent v. Tillson, 140 U. S. 316, 11 S. Ct. 825, 35 L. Ed. 419); and (3) a reasonable opportunity for presentation of such evidence and argument as are appropriate to the proceeding (Londoner v. Denver, 210 U. S. 373, 385, 386, 28 S. Ct. 708, 52 L. Ed. 1103).

[5] As this order of the Commission is, in part, directed at the entire membership of the Chamber and as only 13 of the total membership of 590 were made respondents and served with notice of the complaint, obviously, the unserved members are not parties to the proceeding nor bound by the order unless they can be proceeded against as a class. When procedure against a class is proper in judicial proceedings, there would seem no reason why the same thing should not be done in less formal hearings, such as this, provided always that the conditions are such as to make the class representation rule applicable. Such practice has been recognized in hearings before this Commission. Southern Hdwe. Jobbers' Ass'n v. Comm. (C. C. A.) 290 F. 773, Fifth Circuit. These necessary conditions are (1) a common or general interest and (2) such number of individuals as to make it impracticable to bring all of them before the court. Penny v. C. C. & C. Co., 138 F. 769, 773, 71 C. C. A. 135, 8th Cir.; Am. Steel & Wire Co. v. Unions (C. C.) 90 F. 598, 606; McIntosh v. Pittsburg (C. C.) 112 F. 705, 707; 30 Cyc. 135. There would seem to be no room for doubt that the interest of each member of the Chamber in this controversy and order is, in every substantial outline or particular, the same as that of any other member. It is equally clear that 590 members are an impracticable number to be brought into the hearing. Nor is there any question that the particular members served are not fairly representative of all the membership. Therefore, it would seem that this contention should be denied.

## 2. Jurisdiction over Chamber.

Any jurisdiction of the Commission over the Chamber is denied on several grounds.

[6] The first ground is that the Chamber is not organized for profit. This is true. But it is a legal entity which can and does act and it is legally responsible for its acts and entirely amenable to lawful control. It is capable of entering into a combination or conspiracy or of being an effective instrumentality to execute the purposes of a combination or conspiracy formed by others.

[7] A second ground is that the Chamber is not engaged in interstate commerce. The Federal Trade Commission Act (Comp. St. § 8836a, et seq.) was enacted under the power of Congress to regulate interstate and foreign commerce and by its express terms (Section 4) deals only with such commerce. Although the Chamber is not itself engaged in any commerce in the sense of being a trader or shipper, yet it is an instrumentality in the current of interstate commerce which directly affects such commerce and is within the regulatory power of Congress. Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; and see Stafford v. Wallace, 258 U. S. 495, 517, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Hill v. Wallace, 259 U. S. 44, 69, 42 S. Ct. 453, 66 L. Ed. 822; U. S. v. Coffee Exchange, 263 U. S. 611, 621, 44 S. Ct. 225, 68 L. Ed. 475; United Leather Workers v. Herkert, 265 U. S. 457, 469, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566.

[8] A third ground is that any effect of the rules of the Chamber upon interstate commerce is indirect, therefore, regulation of such Chamber is a matter for state action in the absence of congressional regulation. This may be true as a broad general statement. Hill v. Wallace, 259 U. S. 44, 68, 42 S. Ct. 453, 66 L. Ed. 822, and citations in that opinion. But Congress, in the Federal Trade Commission Act, has assumed to legislate concerning "unfair methods of competition" affecting interstate commerce and if any action by or any rule or regulation of the Chamber has that effect it is certainly subject to that act, no matter what the state has or has not authorized or permitted in that respect. Any action by the state Legislature or any decision of the state courts falls blunted if it strikes at this power which Congress vested and had constitutional authority to vest in the Commission. Northern Pac.

Ry. v. Washington, 222 U. S. 370, 378, 32 S. Ct. 160, 56 L. Ed. 237.

[9-12] A fourth ground is that Congress has exercised its regulatory power over such boards of trade in the Grain Futures Act (Sept. 21, 1922, 42 Stat. 998 [Comp. St. Ann. Supp. 1923, §§ 8747⅘ to 8747⅘k]) and that the provisions of that act are exclusive of all other regulation, either national or state. The above act was passed after this complaint was filed but before the order was made herein. As the orders of the Commission are purely remedial and preventative, the effect thereof is entirely in the future. Therefore, the jurisdiction of the Commission should, in this respect, be measured as of the time of the order rather than as of the filing of the complaint or as of the hearing thereon. The above act was passed in pursuance of the commerce power of Congress (Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839) and would necessarily supersede and displace all existing statutes which conflict therewith. Wherein is there conflict between this act and the act creating the Trade Commission? The prime purpose of the Grain Futures Act was to prevent gambling in grain futures. Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. The plan thereof was to prohibit grain future transactions except in "contract markets" (section 4); to require certain conditions in a market before it could become such "contract market" (section 5) and supervision to see that those conditions were lived up to (sections 6 and 8). These prerequisite market conditions were (1) reports of sales; (2) provision for prevention of dissemination, by the board or any member, of false, misleading or known inaccurate reports "concerning crop or market information or conditions that affect or tend to affect the price of grain in interstate commerce"; (3) provision for prevention of price manipulation or "cornering" on its floor; (4) no exclusion from membership of "any duly authorized representative of any lawfully formed and conducted co-operative association of producers having adequate financial responsibility which is engaged in cash grain business, if such association has complied, and agrees to comply, with such terms and conditions as are or may be imposed lawfully on other members of such board: Provided, that no rule of a contract market shall forbid or be construed to forbid the return of a patronage basis by such co-operative association to its bona fide members of moneys collected in excess of the expense of conducting such business." Section 5. It is conceded that the Chamber is such a "contract market." Whether such fraudulent reports, price manipulations or "corners" have, by the above act, been withdrawn from the jurisdiction of the Commission, even though they might constitute "unfair methods of competition," need not be determined as such character of acts are not involved in this proceeding. The provision as to "profit sharing" membership would seem directly concerned here. It seems clear that Congress intended to and did settle this much contraverted economic matter by requiring "contract markets" to admit representatives of co-operative associations which paid "patronage dividends" *to its own members* which, by fair implication, means that such market is not required to admit any other kind of co-operative association—such, for example, as pays patronage dividends to all customers, whether members of such association *or not*. We think this provision of the act is a legislative definition and withdrawal of all other regulatory control over who shall constitute the membership of "contract markets." Therefore, there was no jurisdiction in the Commission to enter those portions of its order, contained in the second division thereof, which forbade:

"(3) Passing or enforcing any rule or regulation, or enforcing any usage or custom, that prohibits or prevents members of the respondent Chamber from conducting their business of dealing in grain according to the co-operative method of marketing grain or according to the patronage dividend plan, like or similar to the method or plan adopted by the Equity Co-operative Exchange.

"(4) Denying to any duly accredited representatives of any organization or association of farmer grain growers or shippers admission to membership in said respondent Chamber, with full and equal privileges enjoyed by any or all of its members or by any or all concerns represented by membership in said respondent Chamber of Commerce, because of the plan or purpose on the part of such organization or association to pay or propose to pay patronage dividends or to operate or propose to operate according to the co-operative plan of marketing grain, namely, the plan of returning any portion or all of its earnings or surplus to its patrons or members on the basis of patronage, whether such earnings or surplus is derived from charging patrons or members commissions or otherwise."

Except as just set forth, the jurisdiction of the Commission existed as to the Chamber.

### 3. Jurisdiction over Publications.

It is contended that there was no jurisdiction to prevent the publications in the Co-operative Farmer & Manager for three reasons: That it would be an interference with the liberty of the press; that it would be enjoining a libel; that such publication is not interstate commerce.

[13-16] The liberty of the press is not an unrestricted license and the abuse of that right is subject to criminal prosecution and to civil liability. It is true that there was no jurisdiction in equity to enjoin publication of a libel (Francis v. Flinn, 118 U. S. 385, 6 S. Ct. 1148, 30 L. Ed. 165), but this was not because of constitutional reasons and such jurisdiction might be conferred by statute (Am. Malting Co. v. Keitel, 209 F. 351, 126 C. C. A. 277, where the federal cases are cited and discussed). Also, publications might be restrained where they were instruments in carrying out a boycott or a conspiracy. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 437, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815. As said in Aikens v. Wisconsin, 195 U. S. 194, 206, 25 S. Ct. 3, 49 L. Ed. 154, "the most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and if it is a step in a plot neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law." Here the elements of boycott and of conspiracy are present. Also the act creating the Commission provides that its orders shall be enforced by the Courts of Appeals and it is clear that such enforcement must be in the nature of an injunction.

[17] The contention that such publications are not interstate commerce is answered by the situation that these publications are found by the Commission to have circulated in interstate commerce and the objectionable statements therein to have been part of a conspiracy to restrain competition in interstate commerce. Loewe v. Lawlor, supra. Therefore, the necessary jurisdiction exists in the Commission and to effectively enforce the valid orders of the Commission is conferred upon this court by the act.

### B. Sufficiency of the Evidence and Findings.

[18] If there is substantial evidence to support the findings of facts, such findings are made conclusive by the act (section 5). While there is sharp dispute in the evidence upon every material issue of fact, there is substantial support for some of the findings of the Commission.

The subject-matter of the order falls logically into the classifications following: Misleading publications and statements, instigation of vexatious litigation, boycott, denial of "patronage dividend" membership, refusal of daily market quotations and the "on track" purchase rule.

### Publications, Statements and Litigation.

[19] There can be no dispute that the Chamber furnished an exclusive market for its members nor that such market had for years had a monopoly of the terminal marketing of grain for a large territory which extended around Minneapolis and into several states other than Minnesota. The evidence is clear that it and its members combined and acted in concert in opposing the Equity, because they disapproved of its basic idea of "patronage dividends," and the Exchange, because it was an attempt to establish a rival market. The evidence supports the findings as to misleading publications and statements, and as to instigation of vexatious litigation. The conclusion that such actions constituted "unfair methods of competition" was a proper legal conclusion from such findings.

[20] It is contended that the entire controversy was precipitated by the Equity and the Exchange and their members who bitterly assailed the petitioners and compelled them to defend their market. This statement seems broadly true. Where a man or association of men are attacked, they have a legal right to give battle, but this must be done in a lawful way. It may be that the Equity and others sought to destroy the market built up by petitioners and it may be that, as charged, false and misleading propaganda was employed in such assault. The use of such means is not justifiable nor can its use, in turn, justify a return fire of like character. Respondents have a right to publish and speak the truth but they cannot legally go further no matter how great the provocation.

[21] It is contended that the objectionable publications ceased four years before the complaint issued and there is no intention to renew them, therefore, there was no basis for the order as to such. It may be that the immediate inciting cause for the publications has vanished or is inactive. However, this is not of itself sufficient to vacate that part of the order although it might be reason for

refusing, without prejudice, an application for the enforcement thereof at this time.

#### Boycott.

[22] Also, the evidence supports the findings of a boycott by the members of the Chamber in refusing to deal with the Equity or its stockholders or with the Exchange or its members. Such conduct is in violation of the act where, as here, it is the result of concerted action and for the purpose of hindering competition in interstate commerce. The evidence clearly establishes that the Exchange is not really a market and the respondents are not, of course, required to regard it as such. But the Equity and its stockholders are producers, shippers or handlers of grain and any concert of action by respondents to treat it or them any differently than other nonmembers of the Chamber are treated is unfair, subject to the order of the Commission, covered thereby and is sustained. The Chamber issued two circulars (No. 405 and No. 634) each of which contained resolutions passed by the board of directors thereof on October 8, 1912, and January 11, 1916, respectively. The gist of such resolutions is as follows:

[23] "That members of the Chamber of Commerce are hereby forbidden to act in any manner as the agent or representative of any individuals, firms or corporations, in the cities of Minneapolis, St. Paul, or elsewhere, not members of the Chamber of Commerce, who are soliciting shipments of grain from the farmers or country shippers in the manner above mentioned, or through any scheme, artifice, or device, by which this Association is falsely represented, either in its dealings or in the right which the shippers get with respect thereto, or at all, unless the person so soliciting such shipment can show a written statement of the shipper to the effect that he realizes that the person receiving such shipment is not a member of the Chamber and cannot get advantages out of the Chamber which he could not himself get."

While these resolutions are sufficiently fair in their expressions, yet the purpose thereof is clear when the situation then prevailing is considered. That purpose was so to hamper and obstruct dealings between members of the Chamber and the Equity or its stockholders as practically to prevent such. As construed and enforced, the resolutions would have effected such purpose. The Commission was justified in concluding that such resolutions were an effective boycott and, as such, properly to be forbidden.

#### Patronage Dividend Membership.

[24] The findings as to denial of membership in the Chamber to "patronage dividend" concerns is admitted. Under the operation of the "contract market" regulation, this now applies only to such concerns as pay such "dividends" to customers who are not bona fide members of the concern. While this finding is unchallenged, the order thereon is not justified because Congress has declared (Grain Futures Act) that membership must be accorded only to concerns which pay such dividends to their bona fide members. Such order is, also, without the jurisdiction of the Commission, where, as here, the market is a "contract market" under the Grain Futures Act because such markets are placed within the exclusive jurisdiction of the Secretary of Agriculture in this matter of membership.

#### Market Quotations.

[25] There is no dispute as to the fact that the Chamber has, does and will continue to refuse its daily market quotations to the Equity, the Exchange, the stockholders and members of either of them. There can be no doubt as to the harmful effect upon these parties of such refusal. There can be no doubt that such refusal injuriously affects the competition of such parties with the members of the Chamber and others. The claim is that such quotations are property, are the exclusive property of the Chamber and that it has the right to refuse them to such as it sees fit. On the one hand, it is true that such quotations are property. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 250, 25 S. Ct. 637, 49 L. Ed. 1031; Hunt v. N. Y. Cotton Exchange, 205 U. S. 322, 333, 27 S. Ct. 529, 51 L. Ed. 821. On the other hand, it is true that the business of the Chamber "is affected with a public interest and is therefore subject to reasonable regulation in the public interest" (Chicago Board of Trade v. Olsen, 262 U. S. 1, 40, 43 S. Ct. 470, 67 L. Ed. 839), and this has been expressly decided in connection with the publications of market quotations (Chicago Board of Trade v. Olsen, 262 U. S. 1, 41, 43 S. Ct. 470, 67 L. Ed. 839; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 249, 25 S. Ct. 637, 49 L. Ed. 1031; N. Y. and Chicago Grain Exchange v. Chicago Board of Trade, 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 Am. St. Rep. 107). As to such regulation, the court, in the Olsen Case (page 41 [43 S. Ct. 479]), said: "Congress may, therefore, reasonably limit the rules governing its conduct with a view to preventing abuses and

securing freedom from undue discrimination in its operations."

[26] But whatever may be the power to regulate the use and, possibly, the distribution of this character of property, no such general proposition is here involved. Here the controversy is between competitors. It would be a strange situation, logically or legally, where one could be compelled to furnish its own property to a competitor to be used as a major weapon of its own destruction. Such a legal situation seems to be denied by International News Service v. Associated Press, 248 U. S. 215, 239, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. While the Exchange is really not able to function as a terminal market, yet, it would do so if it could and it is a bitter competitor of the Chamber and intent upon the replacement and destruction of the Chamber. Also, the Equity is the principal member and the mainstay of the Exchange and to furnish it or other members of the Exchange with such quotations would inevitably result in their use by the Exchange and would have the same effect as furnishing them to the Exchange directly. The Exchange was formed by the Equity as its instrument for destroying the Chamber. That was the expressed purpose of its formation. Competition is by no means legally free from proper restraint, and it is beyond all reason to require any one to furnish the means of his own destruction to another who is bent upon accomplishing such destruction. We think the order of the Commission respecting the furnishing of market quotations is invalid because it is not, under the circumstances, conclusively shown by this record, an unfair method of competition for the Chamber to refuse to supply such quotations to these parties covered by the order.

## "On Track" Rule.

[27] There are three provisions of the order of the Commission (paragraphs [5], [6] and [7] of the second division, quoted above from the order) which are aimed at the same general matter. Each strikes at features of the, so-called, "Uniform Commission Rule" of the Chamber, as interpreted and enforced by it. To determine the purpose and effect of these provisions of the order it is necessary to understand the purpose, place and effect of the above rule in the scheme of grain marketing, of course paying particular attention to the features of that rule intended to be affected by the order. Since this rule is not an isolated circumstance but an integral element in the operation of the Chamber as a great terminal grain market, no adequate comprehension of

its purpose, of its place in the marketing of grain nor of its effect thereon can be obtained without an outline perception of the existing plan of grain marketing, of which it is a part.

The problem of marketing any article is that of bringing the seller and the buyer together. When that article is of a character having many scattered sellers and many scattered buyers, it is of prime convenience to have definite marketing places, recognized as such by buyers and by sellers, to which both may resort. Grain is essentially of this character. It is produced in varying and relatively small quantities on countless farms scattered over a dozen great agricultural states. The users (millers, feeders, exporters, etc.) are many and scattered. While other grains (oats, barley, rye, and flaxseed) are dealt in at many terminal markets, the importance and volume of wheat and corn have caused, determined and developed such markets. The number, location and development of these grain markets in this country has been along natural lines laid down by economic considerations arising from the character and necessities of the business of getting the grain from the producer-seller to the user-buyer. The movement of grain, along inevitable channels, determined the location of the various markets. It trickled from the farms to the local shipping point, whence it flowed along the lines of transportation to the nearest important transportation terminals which became natural reservoirs into which the grain poured and collected in enormous quantities and from which it was, in turn, distributed. Such terminals were the logical places for the grain intended for sale to collect and, because the grain must come there in quantity, such were the places to which the buyers naturally came. These terminal markets into which the grain came first from the fields are known as "primary markets," distinguishing them from other terminal markets which receive grain more largely from the primary markets than from the fields. Minneapolis is the largest primary market for wheat in the world.

The older grain markets in this country have usually developed out of local organizations formed for the purpose of building up the trade and commercial importance of the particular city in which established and, at first, were not confined to grain but extended to other general trade activities of the city. Such organizations naturally adopted and acted under rules adapted to promote the purpose in view. As the grain trade in a city grew, the necessity for an organization devoted to that particular business resulted in the

evolution thereof from the older general organization. This change in purpose of the organization naturally resulted in changes of the character of membership. The Chicago Board of Trade and the Minneapolis Chamber of Commerce are of this class. The Chamber was organized in 1881 under a state statute authorizing the incorporation of local associations for the advancement of the general trading interests of the community. In 1882, there were 541 members of which only 186 were connected with the grain trade. In 1917, there were 558 members of which all but one were interested in the grain trade. Thus, the evolution of the Chamber was from a general organization to build up Minneapolis as a commercial center into a great primary grain market located at that city and devoted to developing that feature of the city's commercial life. This consideration has a bearing upon the matter before us.

Another and very important consideration is the place and functions of commission men in this marketing organization. There are three major elements in this, as every other great grain market. They are the buyers (millers), the elevators (usually including the exporters) and the commission men.

Minneapolis is one of the largest flour milling centers in the world. These mills consume between 75,000,000 and 100,000,000 bushels of wheat yearly. The water power at St. Anthony's Falls very early invited mills and they were established there years before the Chamber was formed. In fact, the existence of these mills was a main cause in the initial establishment of the grain market there. The vast development of the milling industry has been an outstanding feature and reason for the growth of the cash grain market at Minneapolis. All of these local mills, as well as some other mills which are within the milling territory tributary to this market, are represented in the Chamber and buy their grain there.

Another class of membership is the elevator men. While some of them perform the functions of public warehousemen of grain, their place in the market (buying and selling) is as grain dealers. They are buyers and sellers of grain who receive their pay in the profit they are able to make through ownership of grain. They buy the grain at local country points or on the Chamber floor, condition it and store it until a favorable market for sale. They form a useful, in fact a necessary, part of the grain marketing business. They condition the grain and they store it. The conditioning of grain is useful in that it

preserves it and raises its value. As it comes from the field, the grain has more or less dirt, foreign matter and other seeds mixed with it and contains more or less moisture. It is cleaned and dried in the elevator. Grain in storage will heat and deteriorate unless turned and handled. The elevator has facilities for keeping the grain in good condition. The crop movement from the fields is essentially seasonal and limited in time. It begins with the harvest and is speedily hauled by the farmers to the local station where it is sold or is shipped to the terminal market for immediate sale. The local elevator usually lacks both facilities for conditioning the wheat or capacity for storing large amounts of it. As the consumption of grain is not seasonal but an all year matter, the large terminal elevators are necessary to store and care for the flood of grain until it is needed by consumers. Having the above functions and making their money from the ownership of grain, the elevator men are dealers in grain; that is, buyers who do not consume but who handle and store and try to sell at a profit. Therefore, in so far as they operate on the trading floor, they are sometimes buyers and sometimes sellers. As either, they usually are acting for themselves.

The third important class of membership is the commission men. They are not consumers of grain. They are not dealers and handlers of grain who expect to make a profit out of the buying, holding and later sale of grain. Their business is to buy or sell, as agent for a principal, the grain of others, charging for such service a commission. While they may buy as well as sell, the fact that the principal buying interests (millers and elevators) have their own members on the floor, naturally aligns the commission men on the selling end of a vast majority of the sales on the floor. As none but members can trade on the floor, the commission man is the channel through which a nonmember can transact business in the market. The producers of grain are the largest selling class. The commission man is their only representative in the great terminal markets which offer a ready and constant market for grain and the transactions on which make the prices for grain. We are not concerned in this suit with any other theory or plan of marketing than the one actually existing and in operation. As grain markets are now organized, the commission man is the salvation of the grain producer. We need go no further than the history of this particular market to find ample proof thereof.

By 1860, there were twenty mills at

13 F.(2d)—44

Minneapolis. From 1860 to 1880, practically the only demand for wheat at Minneapolis was to supply the mills there. These mills had formed the Minneapolis Millers' Association as a purchasing agency. This agency sent its representatives out to the local shipping points. In some instances, there may have been country elevators operated by the mills. There were elevators established along the lines of the railroads at country shipping points, known as "line elevators," and owned by the railroads or by elevator companies. Prior to 1880, the flow of grain was almost entirely to the mills, the consignment business was insignificant and the millers were in control of the situation. This was a most disadvantageous situation for the producer. He had no terminal market to which he could consign his grain and no one who could represent him at the terminal. He was confined to the limited market at his local shipping point. At that place his only customers were the organized buying agency of the millers or the line elevator which must later sell the wheat to the millers making a profit for itself. Thus the producer had his market limited to the local shipping point and, even in that market, was at the mercy of the buyers. The inevitable result of this situation was that the producer was compelled to accept much lower than his wheat was worth—at times as much as ten cents a bushel less. Men who were familiar with selling grain as a business, recognized the opportunities presented. They came into this field as commission men who would receive consignments from the country and sell to the millers at Minneapolis or, if no satisfactory market could be found there, would forward the grain to some other terminal market for sale. The opposition of the millers to this interference with their buying monopoly is graphically revealed by an experience of one of these early commission men (Col. George D. Rogers) as follows:

"Shortly after coming to Minneapolis I sent out circulars to all former patrons announcing that I would handle their grain on commission. A few days later came a letter from a farmer at Luverne informing me that he had shipped three cars of No. 1 wheat, such as was desired by the millers. When the cars arrived I took a sample from each, went to the 'agent' of the Millers' Association and asked for a price. 'Where did this grain come from?' he asked. 'I thought it was quality of grain rather than point of shipment you were seeking,' was my reply. He then explained that if the grain was shipped to me from a station where the millers' association had an agent, the mills would not buy it. They had an agent at Luverne and he refused to buy it. Nothing was left for me to do but ship it to Chicago. The wheat was loaded in cars which the railway refused to allow to leave their lines. Hence I requested that three larger cars be parked alongside the grain cars, hired half a dozen men with shovels to transfer it, and went to bed. Next morning when I drove to the siding I found the millers' agent on deck. He asked me what I was doing with the wheat and then offered to take it off my hands at the price I had quoted the preceding day."

The effects of this intrusion and establishment of the commission men were as follows: It established a terminal market where the producer could sell his grain through a trained agent; it broadened the usefulness of that market by bringing in other buyers than the local millers, because the very establishment of such a market attracted outside buyers; it released the sellers from the domination of buyers at that market, because the agent could, if advisable, forward the grain to some other terminal market; it gave the producer the valuable services of a selling agent who knew the grain trade, was familiar with grain prices and the conditions affecting them and was interested in procuring the highest price for the grain; it relieved the producer from the buyers' monopoly of the country shipping point market; it provided a ready market for the increasing production of grain naturally tributary to Minneapolis and one where the prices were in harmony with the grain markets of the world; it insured to the producer the value of his wheat as determined by the markets of the world, less only the necessary marketing expenses and the selling commission, instead of leaving him at the mercy of the buyer at his local shipping point; it raised and stabilized the prices at the local points because the producer could ship to the terminal if the local price offered him was out of line with that at the terminal. In short, it substituted the buyers of the world for the country shipping point monopoly of millers or of line elevator men. The growth of the market has been along these lines, resulting in the millers doing most of their buying on the floor and in a decrease in number of line elevator companies and a corresponding increase in the number of commission men. Another development has been that the line houses have become largely owned by or identified with the large terminal elevator men. These changes in condition were initiated by, developed because of and, at present, depend largely upon the commission men.

With the background of the above outline of the general place and functions of the commission men in this market, we turn to the particular matters and conditions aimed at by these three provisions of the order of the Trade Commission. In a highly organized market consisting of three major elements (buyers, dealers and commission men) we may expect to find rules which govern all members in their dealings with each other and also rules which have particular application to one or more of these elements in its dealings with nonmembers. One of the important rules having such application to commission men is that establishing a definite rate of commission. This is known as the "uniform commission rule." The form of the rule establishes a "minimum" commission but it was clearly understood and experience has conclusively demonstrated that the effect of the rule was to establish a fixed definite commission. Competitive business conditions of a seemingly permanent character have always prevented a charge by any member of a commission above the fixed minimum. The constant struggle among the commission members has been to maintain this minimum and prevent rebating of any portion thereof through any device. Section 11 of Rule VIII makes it a violation of such rule to, in any manner, cut, assume, rebate, or evade, directly or indirectly, the charge of the full minimum commission. It is thus apparent that the commission rule is defined largely by reference to the prohibitions against violations. This record teems with instances of interpretations by the Board of Directors of what acts constitute a violation of this rule. A few instances of things held to be violations will reveal the meticulous care and sensitiveness with which this rule is guarded from supposed infractions. Such are: Payment of commission to nonresident solicitors of shipments; payment for telegrams and telephone messages from shippers; not charging fixed or current rate of interest on advances and loans to shippers; paying hotel bills of visiting shippers; deposit of money in banks to influence shipments; giving shippers twenty-five dollar registering machine to induce shipments.

It is with a violation of this rule that the order of the Trade Commission deals. That violation relates to a limitation of prices which may be paid in purchases by members of "on track" grain. This violation is not now an interpretation, by the Board of Directors, of the general prohibition against rebating or evading the uniform commission rule but is now incorporated in the rules themselves. A portion of section 10 of Rule VIII is as follows:

"Every member of this Association, and every person, firm and corporation admitted to trade or to do business therein, hereafter buying directly or indirectly, for his, their or its own account or otherwise, any grain or seeds dealt in upon this exchange, in carload lots on track at country points, for shipment to Minneapolis, or buying any of the same to be delivered at Minneapolis, shall make their bids, offers and purchases therefor on the basis of the Minneapolis market values less commission or a profit at least equal to the established rates of commission on said grain or seeds; and in addition such bids, offers, or purchases shall be made subject to the usual and the same charges of this Association, to include, and they shall include, switching, inspection, weighing, freight—if a 'delivered' bid and freight on dockage if a 'track' bid—interest on advances, and all other charges according to the rules of this Association, the same as if said grain or seeds were handled on commission through said Association; and they shall render an account to the seller for all such purchases, including said charges separately stated in detail."

A corresponding portion of section 11 of the same rule is that "every member  *  *  * who shall  *  *  * with intent to cut, or to evade in any way directly or indirectly the regular rates of commission established by the rules of this Association, purchase, or offer to purchase any grain, or seed on track, at any railway station outside of, and for delivery at the city of Minneapolis;  *  *  * shall be deemed guilty of violating the rules of the Association establishing rates of commission.  *  *  *"

The plan of organization of the Chamber contemplates that the board of directors shall construe the rules. Therefore, the construction of the above rules by that board becomes virtually a part thereof so that it becomes necessary to know such construction in order to measure the practical scope and effect of the rule. The "on track" provisions were by amendment to the rules. Just when this amendment was made does not appear, beyond that it was between October, 1908, and May, 1912. But before the rule had been thus amended, the board of directors had (August 10, 1904) construed the rule as to uniform commissions to forbid the purchase or offer to purchase "any grain or seeds in the interior for shipment to Minneapolis without making due allowance for all charges  *  *  * including commission.  *  *  *"

In October, 1908, the board had construed the above-quoted words, "in the interior," as not applying to purchases at other terminal markets for shipment to Minneapolis. The above constructions of the old rule were embodied in the amendment. It is clear, from the evidence showing construction by the board as well as from the text of the amendments, that the amendment had no application to purchases at other terminal markets for shipment to Minneapolis nor to purchases anywhere for shipment elsewhere than to Minneapolis. Whether all country on track purchases by members shipped to Minneapolis are intended is not entirely clear. Before the amendment and immediately after the board had construed shipments to Minneapolis from "the interior" to be a violation of the old rule (August 16, 1904), the board determined that such interpretation applied to millers as well as all others. Also, in considering the application of the amendment to a purchase bought for shipment to another place but passing through Minneapolis for inspection (September, 1913) the Committee on Investigation held the transaction "may be technically correct." In this record, the secretary of the board testified that the amendment was applied only to shipments bought "with the intent and for the purpose" of *resale on the trading floor of the Chamber;* that it had no application to grain not so resold; that, as Secretary, he had for many years so advised members and that for many years members had bought such grain for shipment to Minneapolis, but not for resale on the floor, without reference to the amendment. The same construction is placed upon the amended rule by counsel for the Chamber; there is no challenge of this position and no evidence, except as above noted, refuting the practice as testified by the Secretary. Therefore, we accept that as the meaning and proper construction of the amended rule. As thus construed, the amended rule is, in effect, that purchases of "on track" grain at country points by members for resale or which is resold on the floor of the Chamber must be at the then existing price on the Chamber less the usual charges and the regular commission. It is the enforcement of this rule which this order of the Trade Commission declares unfair competition and to be forbidden.

Counsel for the Commission contend that this rule is objectionable for the reasons following: (1) It prevents or restricts bidding for "on track" grain; (2) it discriminates between "on track" grain at country points and at terminal markets; (3) the enforcement of similar rules in other exchanges prevents or restricts competitive bidding between these markets for country "on track" grain. To ascertain how far this position is well taken it is necessary to examine the pertinent facts. Minneapolis is the largest primary wheat market in the world and the second as to all grains. It is unimportant as a corn market because located north of the "corn belt." Wheat and other grains (corn much less so) require storage and care to prevent deterioration. The producer rarely possesses facilities for such storage and care. Also, he is usually unable financially to hold his grain long. Therefore, the producer must have a ready market for the grain soon after harvest. Several methods of sale are open to him as follows: To local elevators; "on track" at his local shipping point; "to arrive" at a terminal market; and consigned for sale at a terminal market. "On track" means grain loaded in cars ready for shipment. "To arrive" means grain to be shipped to a terminal market, the delivery, under the sale, to be on arrival within a designated time. The last of the above four methods is the normal commission transaction where the commission man acts as selling agent at the terminal for the producer. The three other methods are outright sales in which the first two contemplate delivery at the local point and the third, delivery at the terminal point. Thus, the producer has a choice of a local market or a terminal market. In the terminal market, he has as possible customers all of the buying interests which gather there. In the local market, he has as possible customers the local elevator (or elevators) and those who will bid for his grain loaded in cars "on track" or "to arrive." The local elevator men (line or independent), as buyers, are grain merchants, the natural interest of whom is to buy as low as possible. Local elevator and "on track" or "to arrive" buyers are naturally in competition. A rule which restricts, as this rule does, the price which the "on track" and "to arrive" buyers may bid affects the price at the local market. The extent to which the local price is thus affected is, of course, not susceptible of definite ascertainment, but certain known conditions governing the local market strongly argue that this effect is not great. Those conditions arise from the relation of the local to the general market. The local market is not an isolated unit controlled by its own conditions and making its own prices. The conditions which control the price of grain are world wide and the prices of grain are made at the great terminal markets. The great consumers and exporters go

to those terminal markets and many of them form a constituent part therein. The period when they went into the local markets has virtually passed as to consumers and is passing as to the exporters who are, in the main, large dealers operating terminal elevators. It is inevitable that the movement of by far the greatest volume of grain should be to the terminal market. Practically all buying in the local markets is for the purpose of resale in the terminal markets. The commission man buys locally to resell promptly at the terminal. The local elevator buys, usually, as a grain dealer for the same purpose. Necessarily, the local market prices are closely governed by the terminal price. Although the above natural conditions, if unrestrained, rather narrowly fix the maximum local market price, it is clear that a limitation of that price, for members of the Chamber, to the extent of the full commission would have an influence of restraint upon the local price.

As part of the grain territory may be fairly tributary to more than one terminal market and as the prices on different terminal markets usually maintain a relative level (depending upon freight charges and the grain movement), the same general effect on the local market in such territory is felt through enforcement, by other terminal markets, of rules similar to the above rules of the Chamber.

The alleged discrimination favoring grain shipped from other terminal markets to Minneapolis is not substantial. Minneapolis is the greatest primary wheat market; grain coming from other terminals would normally come from production tributary to those markets; usually it would have already undergone one or two commission charges in those markets; purchases in those markets would be governed by the prices prevailing there and not at Minneapolis.

Our conclusions are that the objection of counsel as to discrimination against "on track" grain in favor of grain shipped from other terminal markets is unsubstantial; but that the enforcement of the rule of the Chamber as to "on track" grain does, at least to some degree, restrict the maximum prices thereof.

Is there substantial evidence that this restriction is "unfair" in the sense that it should be removed as a restraint upon free trading for "on track" grain at local shipping points? This question is not answered by determining that such restriction exists. The crucial inquiry is as to the *unfairness* of the restriction. The legal rule is laid down (in a case involving a rule of the Chicago Board of Trade limiting the price members thereof might pay for grain during the non-trading

hours of that organization) by the Supreme Court (Chicago Board of Trade v. U. S., 246 U. S. 231, 238, 38 S. Ct. 242, 244 [62 L. Ed. 683]) as follows:

"But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

According to this legal rule is it pertinent to examine the entire situation surrounding the restraint; including therein, "The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained; * * *" "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was applied; the nature of the restraint and its effect, actual or probable."

The history of this restraint, the evil believed to exist, the reason for the rule, the purpose or end sought therein and many of the facts peculiar to the business may be discussed in a connected account. The Chamber was organized in 1881, through the efforts of grain commission men who were thrusting themselves into a situation where there was no terminal market for the producer and where the local market of the producer was dominated by the millers and by the line elevators which sold to these millers. The livelihood of the commission men was and is earning commission for selling or buying grain. Success depends upon the amount of the commission and the volume of business. The early rules established a fixed commission through the minimum commission rule. Because it augmented the volume of business and, probably, because the producers or shippers had not been accustomed to consign grain for sale by an agent, there was a sub-

stantial purchase of grain by commission men at country points from producers or local dealers for the purpose of resale at Minneapolis. The volume of business was thus increased. The commission men early recognized that this practice imperiled their chief purpose, which was to build up a purely commission business through consignment of grain to them at Minneapolis and, also, that it afforded an easy means of evading the commission rule. Prior to 1883, comparatively little grain was so consigned. In 1889, some of the commission men of the Chamber formed an association, called the Grain Receivers' Association of Minneapolis, for the purpose of combating this practice among them. The association agreement stated that: "Believing that the practice of buying wheat on track at country points is injurious to the legitimate commission business of the city do hereby agree that we will not buy or offer to buy for shipment to Minneapolis or Minn. Transfer any wheat at county stations either from dealers or farmers. This is not intended to prevent persons operating elevators at country points from buying from farmers at such stations."

This association increased materially in members and importance and, in September, 1894, adopted articles of association declaring:

"Members of this Association being also members of the Chamber of Commerce are governed by the rules of that Association regarding commissions, payment of commissions to parties located in the country, etc. and further agree when they become members of this Association that they will not buy or offer to buy for shipment to Minneapolis or Minn. Transfer any wheat at country stations, whether from dealers or farmers. This is not intended to prevent persons operating elevators at country points from buying from farmers at such stations through their elevators or warehouses."

Later in that year the association issued a circular stating:

"That the chief object of the Association is to prevent the cutting of commissions, either by rebate or bonus, or any other method injurious to the welfare of the grain interests centered at this market, and equally so to the grain merchant from whom shipments are received—in other words, to prevent the abuse of the rules laid down by the Chamber of Commerce. A majority of its members believe, and it has been agreed, that buying wheat on track, at stations, is injurious to all concerned, and have pledged themselves to discontinue such practice in which the elevator interests have joined, by refusing hereafter to permit their men to buy outside of the elevators, or to interfere with track shipments."

In August, 1904, the Board of Directors of the Chamber construed the existing uniform commission rule to require "on track" purchases at country points for shipment to the Minneapolis market to be based on Chamber prices less charges and commission and, in 1908, determined that this did not apply to purchases at other terminal markets. Between 1908 and 1912, these constructions were embodied in the present rule. The above recital of the history of the development of the present rule leaves no doubt that the purpose in view was to develop and protect the commission business of the members of the Chamber. It is clear that there was no purpose to depress or control local prices for the benefit of any one. That result was not sought and was but an incidental outcome of carrying out the only purpose in view. It is certain that the evils feared by the commission men from the conditions existing before this amendment of the rules were present and would have seriously imperiled the entire commission business. The means taken in the rule to protect that business were reasonable and as lenient as would be effective for achievement of the end in view. While the earlier agreements of the Grain Receivers' Association sought to entirely prohibit this country buying by members who were commission men and were using such purchases merely as a means of earning the equivalent of a commission, the rule did not prevent such buying but merely placed it on the same basis as though the grain bought had been consigned.

The "condition before and after the restraint was applied" are evident. One of the outstanding features has been the pronounced development of the commission element in the Chamber and a corresponding decline in the line elevator business. The terminal market for the producer and country shipper has been established on a firm basis and the seller of grain is no longer at the mercy of the buyer. Where formerly the buyers controlled what terminal market there was, now the seller has a choice of a number of highly trained agents who are vitally concerned in securing the best price for his grain and who look after and care for his interests. It seems evident that the careful protection of the uniform commission rule has preserved and developed the commission business and that business has, in turn, created and developed the selling end of the terminal market. The greatest beneficiary thereof is the producer, for he is always a seller. This condition of improvement, through the activities of commission

men, is not confined to the terminal markets but extends to the local market. Before the time of the commission men and the establishment of the Chamber, the local markets were closely gripped by the organized millers and the line elevators which largely sold to those millers. The producer or the independent local elevator was well nigh helpless in procuring an adequate price for the grain locally marketed. The commission men introduced a new buying element into that market when they entered it. This element was greedy for the grain because its success depended upon the volume of grain handled. It raised prices because it was satisfied with the profit of a commission. It stabilized the prices and placed them in line with the wheat prices of the world because its dealings were based upon the prices of a great terminal market. It not only had the above effects upon the local market because of purchases, by commission men, of "on track" and "to arrive" grain and because it furnished a sure outlet for the grain of the independent local elevator; but there is another important effect. That is the increasing development of the independent local elevator business and the decline of the line elevator. This is being brought about by commission men financing such independent concerns, which usually take form as farmers' elevators owned and controlled by local farmers who use the shipping point. This movement is characteristic of the Minneapolis market and has been much more developed there than in any other terminal market. The commission men, each year, loan very large aggregate sums to such elevators to enable them to handle the local incoming grain. This has introduced a local buying element controlled by the producers themselves. The present evolution in the local market is the development of these farmers' elevators and the consequent retirement of the line elevators from the local market. Apparently, the most plausible reason for this retirement is that the line elevators, which are interested in buying as low as possible, cannot compete with the prices locally offered by the independent elevators and the commission men. This is further proof of the favorable effect upon local prices through the buying activities of the commission men in the local market.

It seems pertinent to examine the probable effect of the removal of this restriction, which is what the order of the Trade Commission intends. The Commission thought the rule had the effect of limiting the prices at local markets and that if this restraint were removed it would result in higher local prices to the producer. If this should occur it would not be the only result. It would eliminate the line elevator (already withdrawing) as a local buyer. It would cripple and tend to eliminate the independent local elevator, also a local buyer, because such elevator is, as to buying, a grain dealer which must find its sale market at the terminal market where it is subject to all terminal marketing expenses including commission. It would, also, affect the financing of independent local elevators (farmers' elevators or other) because of the increased financial risk. Thus it would cripple or eliminate from the local market all buyers except the commission men. The local competitive buying would be between commission men. If this character of competition resulted, it would mean the lessening of consigned grain; the death of the uniform commission rule; and the elimination of all but a few financially strong commission men who could build up such a volume of local buying that they could reduce the commission profit to the minimum. It would reduce the commission to where only the strongest commission men could survive. It would tend to change commission men into temporary grain handlers. All of these probable changes arise from a diminution, through unbridled competition, of the established commission and the result sought by the Trade Commission could not occur at all except through diminution of the Commission. All of these changes affect the stability, if not existence, of the only agency which the seller (producer or shipper) has in the terminal market where the ultimate price of his grain is made. Such changes are not merely regulation or evolution, they threaten revolution in a method of marketing which has been built from experience and the general course of the development of which has been constantly in the direction of greater protection to the rights of the producer and shipper.

This same character of rule has been upheld in a learned opinion, reviewing the authorities, in the Supreme Court of Minnesota. State v. Duluth Board of Trade, 107 Minn. 506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260. Also see Board of Trade v. U. S., 246 U. S. 231, 38 S. Ct. 242, 62 L. Ed. 683; Hopkins v. U. S., 171 U. S. 578, 19 S. Ct. 40, 43 L. Ed. 290; Anderson v. U. S., 171 U. S. 604, 19 S. Ct. 50, 43 L. Ed. 300.

We conclude that the purpose of the rules attacked was innocent; that the ends sought to be accomplished therethrough were proper; that the means were reasonable; that there is no substantial evidence that such restriction as necessarily results therefrom is undue or unfair; that the evidence (all of which, including the numerous exhibits, has been carefully read and considered) does not justify

the order made by the Trade Commission in these respects.

The suggestion is presented that the rule should not apply to grain on track at St. Paul offered for sale by nonmembers to members of the Chamber, because St. Paul and Minneapolis have a common freight rate and constitute really one railway terminal. To permit this would be a very palpable evasion of the uniform commission rule without even the advantages to the local shipping point market which the order intended. It would introduce an additional grain handler who would have to receive compensation if the grain were not shipped direct by the country shipper. If it were shipped direct, it would have all of the practical characteristics of a "to arrive" shipment or of a consignment and the removal of the rule as to such would merely be a device to evade the rule in the terminal market itself. The immediate bearing of this phase of the matter was the existence of a co-operative terminal marketing organization, the Equity, which was using its full power to displace the Chamber by endeavoring to establish another terminal market, at St. Paul. The endeavor to establish such market was unsuccessful and the Equity found itself compelled to market much of its grain through the Chamber. No reason appears why this concern should have any other or better marketing position than any other nonmember of the Chamber who has grain to sell in the Minneapolis market.

## C. That the Order is Indefinite.

[28] It is claimed that the order is so indefinite in its terms and requirements that it cannot be safely interpreted and obeyed and, therefore, should not be enforceable. The requirements are somewhat general, but necessarily so. Omitting the provisions relating to market quotations, membership in the Chamber and uniform commission rule because, in our judgment, not valid, for the reasons above set out, an outline of the remaining requirements of the order is as follows: The first forbids conspiracy to publish or circulate false or misleading statements concerning the financial standing, business or business methods of the Equity, its officers or stockholders, or of the Exchange, its officers or members; the second forbids the institution of vexatious or unfounded suits against the Equity with the purpose of hindering or obstructing its business or of injuring its credit or reputation; the third forbids conspiracy to boycott the Exchange, its members, the Equity, its stockholders or the customers of any of them because of their patronage dividend plan of doing business. These three requirements are

clear, not difficult of understanding nor of application. We think this contention should be denied because the order is, in these respects, sufficiently definite to be followed and to be enforced.

### Extraneous Matters.

In considering and determining the matters presented in this review of the order of the Trade Commission, we have tried carefully to confine ourselves closely to the particular issues requiring decision. Other matters appear in the record and are touched upon by counsel. Some of these are co-operative marketing (local or terminal); the amount of the commission fixed by the rule; trading in "futures" and various practices of the Chamber regarded as being vicious or as detrimental to the proper marketing of grain. Such matters are extraneous to the issues requiring decision here. We expressly disclaim an opinion concerning them.

### Conclusion.

Upon the entire order of the Trade Commission presented in this review, our determination is as follows:

(1) That we should sustain those portions reading as follows:

"Now Therefore, it is ordered that the respondents: The Chamber of Commerce of Minneapolis; C. A. Magnuson, C. M. Case, William Dalrymple, A. C. Andrews, B. F. Benson, W. T. Frasier, H. P. Gallaher, J. B. Gilfillan, Jr., H. S. Helm, Asher Howard, John McLeod, J. H. MacMillan, F. C. Van Dusen, John G. McHugh, and all other members, officers, directors, agents, servants and employees of the Chamber of Commerce of Minneapolis, Manager Publishing Company; John H. Adams, and John T. Fleming, and each of them and their or its officers, agents, solicitors, representatives, servants, and employees and all other persons acting under, through, by or in behalf of them or any of them, forever cease and desist:

"From combining and conspiring among themselves or with others, directly or indirectly, to interfere with, or injure, or destroy the business or the reputation of the St. Paul Grain Exchange, or its officers and members, or the Equity Co-operative Exchange, or its officers and stockholders (or other competitors of the respondent Chamber and its members) by

"(1) Publishing or causing to be published in any newspaper, periodical, pamphlet or otherwise, or circulating, or causing to be circulated orally or otherwise, among the cus-

tomers or prospective customers of the members of the St. Paul Grain Exchange, or the public generally, any false or misleading statements concerning the financial standing, the business or the business methods of the said Exchange, its officers or members, or concerning the said Equity Co-operative Exchange, its officers or stockholders.

"(2) Instituting vexatious or unfounded suits either at law or in equity against said Equity Co-operative Exchange with the purpose or intent, or with the effect of hindering or obstructing the business of the said Equity Co-operative Exchange or injuring its credit and reputation.

"It is further ordered that the respondents: The Chamber of Commerce of Minneapolis; C. A. Magnuson, C. M. Case, William Dalrymple, A. C. Andrews, B. F. Benson, W. T. Frasier, H. P. Gallaher, J. B. Gilfillan, Jr., H. S. Helm, Asher Howard, John McLeod, J. H. MacMillan, F. C. Van Dusen, John G. McHugh, and all other members, officers, directors, agents, servants, and employees of the Chamber of Commerce of Minneapolis, and each of them, and their or its officers, agents, solicitors, representatives, servants, and employees and all persons acting under, through, by or in behalf of it or them, or any of them, forever cease and desist from:

"(1) Combining and conspiring among themselves or with others directly or indirectly to induce, persuade or compel and from inducing, persuading or compelling any of the members of said Chamber, their agents or employees, to refuse to buy from, sell to, or otherwise deal with the St. Paul Grain Exchange or its members or the Equity Co-operative Exchange, or its stockholders, or the customers or any of them, because of the patronage dividend plan of doing business adopted by the said Equity Co-operative Exchange, or by any of the members of the said St. Paul Grain Exchange, as more particularly set forth in paragraph (4) infra of this order."

"It is further ordered that the respondents, the Chamber of Commerce of Minneapolis; C. A. Magnuson, C. M. Case, William Dalrymple, A. C. Andrews, B. F. Benson, W. T. Frasier, H. P. Gallaher, J. B. Gilfillan, Jr., H. S. Helm, Asher Howard, John McLeod, J. H. MacMillan, F. C. Van Dusen, John G. McHugh, Manager Publishing Company, John H. Adams, and John T. Fleming shall within sixty (60) days after the service upon them of a copy of this order, file with the Commission a report in writing setting forth in detail the manner and form in which they have complied with the order to cease and desist heretofore set forth."

Because of this review, the sixty-day period allowed for the above report will begin as follows: If no petition for rehearing is filed within sixty days after filing of this order or decree, one hundred twenty days from the filing of this order or decree; if such petition or petitions be filed and denied, sixty days after the day an order is entered in this court denying the same. If such petition or petitions should be sustained, any order entered on this opinion would, of course, be ineffective.

(2) That all other parts of said order should, for the reasons above given as to each, be set aside.

It is so ordered.